UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
ALLIED TRANSIT CORP.,
EMPIRE STATE BUS CORP., and
EMPIRE CHARTER SERVICE, INC.,

                             Plaintiffs,

      - against -

LOCAL 854 PENSION FUND,

                             Defendant.
--------------------------------------------------------------x

**ORDER**

No. 21-CV-10556 (CS)

Seibel, J.

      On March 22, 2024, I issued an opinion and order in the related case *Mar-Can Transp. Co., Inc. v. Local 854 Pension Fund*, No. 20-CV-8743 (S.D.N.Y.) (ECF No. 249), a copy of which is attached.  That decision shall apply in this case.

**SO ORDERED.**

Dated:  April 26, 2024
      White Plains, New York

                                  _____
                                  CATHY SEIBEL, U.S.D.J.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

MAR-CAN TRANSPORTATION
COMPANY, INC.,

                                  Plaintiff,             **OPINION & ORDER**

   - against -                                No. 20-CV-8743 (CS)

LOCAL 854 PENSION FUND,

                                Defendant.

-------------------------------------------------------------x

<u>Appearances</u>:

Jennifer S. Smith
Law Offices of Jennifer Smith PLLC
New York, New York
*Counsel for Plaintiff*

Jennifer A. Clark
Blitman & King LLP
Syracuse, New York
*Counsel for Defendant*

<u>Seibel, J.</u>

      Before the Court are the motion for summary judgment of Defendant Local 854 Pension Fund ("Defendant" or the "Old Plan"), (ECF No. 202), the motion for partial summary judgment of Plaintiff Mar-Can Transportation Company, Inc. ("Plaintiff" or "Mar-Can"), (ECF No. 206), the cross-motion of Plaintiff to exclude the report and affidavits of Defendant's expert Victoria Jones and for leave to file a motion for attorneys' fees, (ECF No. 211), and the cross-motion of Defendant for summary judgment and to strike the reports of Plaintiff's expert Mitchell Hofing, (ECF No. 216).  For the following reasons, Defendant's motion for summary judgment is DENIED, Plaintiff's motion for partial summary judgment is GRANTED, Plaintiff's cross-motion is GRANTED IN PART to the extent it seeks to exclude the expert report of Jones and

seeks leave to move for an award of attorneys' fees, and Defendant's cross-motion is GRANTED IN PART to the extent it seeks to exclude the expert reports of Hofing.

## I.   **BACKGROUND**

### A.   **Facts**

The following facts are taken from the parties' Local Civil Rule ("LR") 56.1 Statements and are undisputed unless otherwise noted.[1]

Defendant Old Plan[2] is a multiemployer defined benefit pension plan.  (P's Resp. to D's 56.1 ¶ 1.)  Plaintiff Mar-Can participated in the Old Plan under a Collective Bargaining Agreement ("CBA") with Teamsters Local 553.  (*Id.* ¶ 4.)  In mid-March 2020, Mar-Can's employees voted in a National Labor Relations Board ("NLRB") certified election to leave the Teamsters union and join Local 854 of the Amalgamated Transit Workers ("ATW") Union.  (*Id.* ¶ 5; D's Resp. to P's 56.1 ¶ 13.)  Upon the NLRB's certification of ATW Local 854 as the collective bargaining representative for Mar-Can employees, the CBA with Teamsters Local 553 was terminated.  (P's Resp. to D's 56.1 ¶ 6; D's Resp. to P's 56.1 ¶ 14.)  That termination

---

[1] I will refer to Defendant's Statement of Material Facts As To Which There Can Be No Genuine Issue, (ECF No. 204), as "D's 56.1."  I will refer to Plaintiff's Response to Defendant's Statement of Material Facts As To Which There Can Be No Genuine Issue, (ECF No. 214), as "P's Resp. to D's 56.1."  I will refer to Plaintiff's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1, (ECF No. 207), as "P's 56.1."  I will refer to Defendant's Response to Plaintiff's Statement of Undisputed Material Facts With Defendant Teamsters Fund's Statement of Additional Material Facts, (ECF No. 218), as "D's Resp. to P's 56.1."  Where a statement in a party's Rule 56.1 Statement is properly supported, and the other side does not specifically deny it *with evidence*, the statement is deemed admitted for purposes of this motion.  *See, e.g.*, *Feis v. United States*, 394 F. App'x 797, 799 (2d Cir. 2010) (summary order); *Wallace v. City of N.Y., Dep't of Educ.*, No. 20-CV-1424, 2021 WL 6127386, at *1 n.1 (S.D.N.Y. Dec. 28, 2021); *Universal Calvary Church v. City of N.Y.*, No. 96-CV-4606, 2000 WL 1745048, at *2 n.5 (S.D.N.Y. Nov. 28, 2000); LR 56.1(c); LR 56.1(d).

[2] The Old Plan is also referred to as the "Teamsters Fund" by the parties.  (P's Resp. to D's 56.1 ¶ 1; D's Resp. to P's 56.1 ¶ 4.)

triggered a complete withdrawal from the Old Plan. (D's Resp. to P's 56.1 ¶¶ 15-16.) The Old Plan assessed $1,798,978 in withdrawal liability against Mar-Can,[3] pursuant to Section 1391 of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1001 et seq.[4] (P's Resp. to D's 56.1 ¶ 8; D's Resp. to P's 56.1 ¶ 21; see ECF No. 206-8 at 1.) While this case has been pending, Mar-Can has deposited withdrawal liability payments into the Court Registry, although the parties dispute whether it has made all required payments. (See ECF Nos. 65, 66; see Docket Entries dated Mar. 18, 2021, April 22, 2021, July 29, 2021, Oct. 28, 2021, Feb. 11, 2022, Aug. 5, 2022, Feb. 3, 2023, Nov. 8, 2023; D's Resp. to P's 56.1 ¶¶ 46-49.)

On or about May 20, 2021, the Old Plan notified ATW and Mar-Can, via letter pursuant to 29 U.S.C. § 1415(b)(2)(A) & (B), that the Old Plan would transfer liabilities valued at $5,479,926 and assets valued at $3,680,318 to the ATW Fund (or "New Plan"),[5] (P's Resp. to D's 56.1 ¶ 13), for 142 of Mar-Can's employees, (see D's Resp. to P's 56.1 ¶ 54).[6] On June 6, 2022, after being ordered to do so by this Court, (ECF No. 184), the Old Plan made the transfer, (P's Resp. to D's 56.1 ¶ 17; D's Resp. to P's 56.1 ¶¶ 54-55). On November 3, 2022, by the same procedure, the Old Plan notified the ATW Fund and Mar-Can about a subsequent transfer of

---

[3] The parties' LR 56.1 Statements both state that the withdrawal liability assessed was $1,798,798, (D's 56.1 ¶ 8; P's 56.1 ¶ 21), but the underlying evidence, (ECF No. 206-8 at 1), says it was $1,798,978. For simplicity's sake, the Court going forward refers to the amount of the assessed withdrawal liability as $1.8 million, as the parties have done.

[4] The Court refers to ERISA sections by their numbering under Title 29 of the U.S. Code.

[5] The ATW Fund is a multiemployer defined benefit pension fund. (D's Resp. to P's 56.1 ¶ 37.)

[6] For simplicity's sake, the Court going forward refers to the amount of transferred liabilities as $5.5 million and the amount of transferred assets as $3.7 million, as the parties have done.

$413,343 in liabilities and $413,343 in assets to the ATW Fund, for two additional employees, which it completed on January 13, 2023.  (P's Resp. to D's 56.1 ¶¶ 14, 18; D's Resp. to P's 56.1 ¶¶ 57-58.)  The ATW Fund did not file an appeal with the Pension Benefit Guaranty Corporation ("PBGC") to block the transfers, (P's Resp. to D's 56.1 ¶ 15), and the deadline for it to do so has passed, (*id.* ¶ 16).

As of the date of filing of Mar-Can's 56.1 Statement on March 31, 2023, the Old Plan had not assessed any reallocation or redetermination withdrawal liability, or any additional withdrawal liability, against Mar-Can in connection with a mass withdrawal.  (D's Resp. to P's 56.1 ¶¶ 60-62.)  The Old Plan has not reduced Mar-Can's withdrawal liability by any amount under either 29 U.S.C. § 1415(c) or 29 U.S.C. § 1391(e).  (*Id.* ¶¶ 51-52.)

### B.    Procedural History

I assume the parties' familiarity with the record, and I briefly summarize the procedural history leading up to the instant motions.  On October 7, 2020, Mar-Can challenged the Old Plan's withdrawal liability assessment and filed a request for arbitration with the American Arbitration Association.  (*Id.* ¶¶ 41-42.)  On October 20, 2020, Mar-Can commenced this lawsuit, asserting that:  (1) under 29 U.S.C. § 1415(b) the Old Plan was required to transfer pension assets and liabilities to the New Plan, and (2) under 29 U.S.C. § 1391(e) the Old Plan was required to reduce Mar-Can's withdrawal liability by an amount equal to the unfunded vested benefits transferred to the New Plan.  (ECF No. 1 ¶¶ 44-56.)   On January 14, 2021, Mar-Can filed an amended Complaint, asserting the same two claims.  (ECF No. 47 ("AC") ¶¶ 69-81.)  The Amended Complaint demands the following relief:  (1) an order directing the Old Plan to initiate the pension transfer; (2) an order directing the Old Plan to reduce Mar-Can's withdrawal liability by the amount equal to the transferred unfunded vested pension benefits; (3)

an order directing the Old Plan to estimate the withdrawal liability to be assessed against Mar-Can upon completion of the pension transfer; (4) an order directing the Old Plan to reissue Mar-Can's interim withdrawal liability payment schedule based on the estimated withdrawal liability; (5) an award of attorneys' fees and costs incurred by Mar-Can; and (6) such other relief as the Court deems just and proper.  (AC ¶ 81.)

On October 13, 2021, after a series of discovery disputes between the parties, the Old Plan moved to compel arbitration and stay the action, (ECF No. 130), which Mar-Can opposed, and on February 8, 2022, Mar-Can moved for partial summary judgment to compel a Section 1415 transfer of the amounts the Old Plan had identified on May 20, 2021, (ECF No. 163).  In a bench ruling on May 31, 2022, I granted Mar-Can's motion, ordered the transfer, and denied the Old Plan's motion to compel arbitration and to stay the case.  (ECF No. 184; *see* ECF No. 187 ("BR Tr.").)  In my ruling, I concluded that while disputes arising under Section 1415 may be arbitrable, (BR Tr. at 25:5-23), there were, for purposes of Mar-Can's motion seeking the Section 1415 transfer, no factual disputes regarding the assets and liabilities to be transferred from the Old Plan to the New Plan under Section 1415, (*id.* at 26:20-27:6).

At that time, the parties did not ask me to determine whether Mar-Can's assessed withdrawal liability should be reduced under Section 1415(c) following the Section 1415 transfer, nor did the parties move to compel arbitration regarding that subject.  (*Id.* at 30:2-5.)  My preliminary view was that the issue – if teed up – would not require arbitration because it appeared to implicate questions of statutory interpretation, did not involve actuarial expertise, and had been considered by other district courts.  (*Id.* at 30:5-12.)  I also noted that depending on how I ruled on the issue if subsequently asked to do so, there might remain a factual dispute to be sent to arbitration regarding the interest rate used in calculating Mar-Can's withdrawal liability.

(*Id.* at 30:9-12.)  Because any such dispute was at that point speculative, I concluded that it did not need to be arbitrated at the time, and denied the motion to compel arbitration without prejudice, permitting the parties to raise it later if necessary.  (*Id.* at 30:13-18.)

I also denied the Old Plan's request to stay the case until the Old Plan completed the procedural requirements concerning a mass withdrawal and Mar-Can proceeded before an arbitrator regarding Mar-Can's initial and mass withdrawal liability.  (*Id.* at 30:19-23; 36:13-15.)  First, I concluded that Mar-Can's request for a Section 1415 transfer necessarily preceded any alleged dispute regarding mass withdrawal liability, and that the PBGC's regulations require a plan to assess and collect initial withdrawal liability before assessing any mass withdrawal liability.  (*Id.* at 31:14-32:4.)  Second, I found that the Old Plan had not yet made a mass withdrawal liability determination for Mar-Can, so there was no ripe dispute for an arbitrator to decide.  (*Id.* at 32:5-33:22.)  Finally, I determined that there was no need to stay the matter to resolve the parties' potential dispute regarding the interest rate assumptions used to calculate Mar-Can's initial withdrawal liability because Mar-Can had not yet challenged those assumptions.  (*Id.* at 33:23-34:9.)

Thus, as neither issue needed to be arbitrated at the time, I denied the Old Plan's motion to compel and for a stay, and because Mar-Can showed that the requirements for transfer under 29 U.S.C. § 1415(a) were met, (*id.* at 35-36), I granted Mar-Can's motion for partial summary judgment.  I ordered the Old Plan to transfer the identified pension assets and liabilities to ATW Local 854 by June 7, 2022, (*id.* at 35:13-22, 38:4-18; *see* ECF No. 184; Minute Entry dated May 31, 2022), and it did so, (P's Resp. to D's 56.1 ¶ 17; D's Resp. to P's 56.1 ¶¶ 54-55).

After continuing discovery overseen by Magistrate Judge Paul E. Davison, and in accordance with the schedule he set, (*see* ECF No. 192), the Old Plan has now moved for

summary judgment seeking an order (1) finding that under 29 U.S.C. § 1415 Mar-Can is not entitled to any reduction in its withdrawal liability following the transfer of assets and liabilities to ATW, (2) dismissing Mar-Can's complaint, (3) awarding the Old Plan's counsel attorneys' fees and costs under ERISA, (4) allowing the Old Plan to submit an affidavit detailing those costs and fees, and (5) granting such other and further relief as is just and proper, (ECF No. 202). Mar-Can has moved for partial summary judgment, requesting an order (1) requiring the Old Plan to reduce Mar-Can's assessed withdrawal liability as required by 29 U.S.C. § 1415(c), (2) directing the Court registry to return the escrowed withdrawal liability payments to Mar-Can, (3) finding any and all appropriate facts as to which there is no genuine issue for trial, (4) granting Mar-Can leave to move for an attorneys' fees award, and (5) granting such other and further relief as the Court deems just and proper. (ECF No. 206.)  Mar-Can subsequently cross-moved for an order: (1) excluding the expert report and affidavits of the Old Plan's expert Jones, (2) excluding any references to a termination mass withdrawal, or the consequences of such an event, pursuant to Federal Rule of Civil Procedure 37, on the grounds that the Old Plan did not produce, and successfully opposed a discovery motion regarding, that topic; (3) finding any and all appropriate facts as to which there is no genuine issue for trial; (4) granting Mar-Can leave to move for an attorneys' fees award; (5) denying the Old Plan's motion for summary judgment in full; and (6) granting such other and further relief as the Court deems just and proper.  (ECF No. 211.)  The Old Plan responded with its own cross-motion for summary judgment, seeking the same relief as in its original motion in addition to an order striking the expert reports of Mar-Can's expert Hofing.  (ECF No. 216.)

## II.   MOTIONS TO EXCLUDE EXPERT REPORTS

I first turn to Plaintiff's cross-motion to exclude the report and affidavits of Defendant's expert, actuary Jones, (ECF No. 211), and Defendant's cross-motion to exclude the reports of Plaintiff's expert, actuary Hofing, (ECF No. 216).  Plaintiff argues that I should exclude Jones's expert report under Federal Rule of Evidence ("FRE") 702 because (1) Jones lacks qualifications, (2) the report is not helpful to the court because it analyzes federal case law and provides legal conclusions regarding how ERISA should be interpreted, and (3) Jones's methodology is unreliable.  (ECF No. 215 ("P's Opp.") at 23-24.)  Defendant argues that Hofing's reports should be disregarded because they contain only legal conclusions regarding the interpretation of ERISA, Congress's intent, and Hofing's opinion regarding an Eastern District of New York decision, *Hoeffner v. D'Amato*, No. 09-CV-3160, 2016 WL 8711082 (E.D.N.Y. Sept. 30, 2016), that addresses the issue raised here.  (*See* ECF No. 219 ("D's Opp.") at 14-21.)

### A.   Legal Standard

"The Supreme Court has assigned to district courts a 'gatekeeping' role with respect to expert opinion testimony."  *Arista Recs. LLC v. Lime Grp. LLC*, No. 06-CV-5936, 2011 WL 1674796, at *1 (S.D.N.Y. May 2, 2011) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). [7]  The admissibility of expert testimony is governed by Rule 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

---

[7] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.

FRE 702.  An expert's testimony must be based on "scientific, technical, or other specialized knowledge [that] will help the trier of fact."  *Id.*  By definition, expert testimony that tells the trier of fact what result to reach does not help the trier of fact make a decision.  *See Nationwide Transp. Fin. v. Case Info. Sys., Inc.*, 523 F.3d 1051, 1059-60 (9th Cir. 2008); *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994).  Further, the Second Circuit has "consistently held . . . that expert testimony that usurps either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it by definition does not aid the jury in making a decision; rather, it undertakes to tell the jury what result to reach, and thus attempts to substitute the expert's judgment for the jury's."  *Nimely v. City of N.Y.*, 414 F.3d 381, 397 (2d Cir. 2005).  "[A]lthough an expert may opine on an issue of fact within the [trier-of-fact]'s province, he may not give testimony stating ultimate legal conclusions based on those facts."  *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991).  "[W]hile an opinion is not objectionable just because it embraces an ultimate issue, the Second Circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion."  *PharmacyChecker.com v. Nat'l Ass'n of Boards of Pharmacy,* No. 19-CV-7577, 2023 WL 2973038, at *15 (S.D.N.Y. Mar. 28, 2023).

Thus, "[a]s a general rule an expert's testimony on issues of law is inadmissible." *Bilzerian*, 926 F.2d at 1294; *see In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) (expert witness testimony precluded if it "impermissibly embraces a legal conclusion"); *In re Golden*, No. 16-40809, 2022 WL 362913, at *11 (Bankr. E.D.N.Y. Feb. 4, 2022) ("[I]n evaluating the admissibility of expert testimony, this Court requires the exclusion of testimony that states a legal conclusion.").  "[W]here an expert testifies as to legal opinions couched as expert testimony" in support of summary judgment, "that testimony cannot be

considered." *In re Golden*, 2022 WL 362913, at \*14; *see id.* at \*11.  An expert "may not testify as to what the law is, because such testimony would impinge on the trial court's function." *PharmacyChecker.com*, 2023 WL 2973038, at \*15.  In short, the rationale, or conceit, of these cases is that "the Court [is the] expert on the law."  *United States v. Cooper*, No. 15-CR-20042, 2015 WL 3819566, at \*2 (S.D. Fla. June 18, 2015).

**B.    Discussion**

The bulk of both parties' expert reports consist of legal opinions or conclusions regarding how to interpret the statue's plain language and analysis of the relevant caselaw.  (*See generally* ECF Nos. 213-25, 213-26, 213-27.)  Such analysis is my job, and thus the reports are neither necessary nor helpful in my consideration of the question of statutory interpretation posed by the pending motions.  *See Thomsen v. Kefalas*, No. 15-CV-2668, 2018 WL 1508735, at \*18 (S.D.N.Y. Mar. 26, 2018) ("It is well-settled in this Circuit that expert opinions as to the interpretation and application of domestic law are inadmissible."); *United States v. Adnan Ibrahim Harun a Hausa*, No. 12-CR-134, 2017 WL 354197, at \*2 n.2 (E.D.N.Y. Jan. 24, 2017) ("[D]ivining the intent of Congress would not be a proper subject for testimony by an expert, whereas statutory interpretation is a proper task for the Court.").  Thus, I exclude the reports of both experts because they "provide[] legal opinions, legal conclusions, [and] interpret[] legal terms; those roles fall solely within the province of the court," *Scott v. Chipotle Mexican Grill, Inc.,* 315 F.R.D. 33, 48 (S.D.N.Y. 2016), and I grant the Old Plan's cross-motion and Mar-Can's cross-motion to the extent that they seek to exclude the other's respective expert reports.[8]

---

[8] Plaintiff contends "it is well-settled that in complex areas of law, expert commentary can assist the Court."  (ECF No. 230 ("P's Reply") at 14; *see id.* at 13-15.)  I recognize that "[e]xpert testimony can . . . be of assistance to the court when the case involves understanding a complex regulatory structure or scheme," but in that case "the proper province for the expert's

III.     **MOTIONS FOR SUMMARY JUDGMENT**

I turn next to the parties' motions for summary judgment. Both parties have moved for summary judgment regarding whether Mar-Can's withdrawal liability to the Old Plan should be reduced under Section 1415(c). (*See generally* ECF Nos. 202, 206, 216.) The Old Plan argues that the statute, based on its plain and unambiguous language, does not require any reduction in Mar-Can's withdrawal liability, pointing to *Hoeffner v. D'Amato*. (*See generally* ECF No. 203 ("D's Mem.") at 4-9; D's Opp. at 2-4, 7-10; ECF No. 226 ("D's Reply") at 2-4.) Mar-Can contends that Section 1415(c) requires a reduction in Mar-Can's withdrawal liability, or, alternatively, to the extent that the statutory language is ambiguous, the legislative history and purpose of ERISA point to the same result. (*See generally* ECF No. 208 ("P's Mem.") at 11-23; P's Opp. at 13-22; P's Reply at 1-7.)[9]

A.     **Legal Standard**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255.

---

testimony is not legal opinion or interpretation or application of the law," which is what the experts have provided here. *In re Golden*, 2022 WL 362913, at *13.

[9] As the motions and cross-motions raise interrelated and overlapping arguments regarding the proper interpretation of Section 1415(c), I consider the issues together.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). Where a declaration is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). "If a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

12

This same standard applies to cross-motions for summary judgment. *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001); *C & A Carbone, Inc. v. County of Rockland*, No. 08-CV-6459, 2014 WL 1202699, at *5 (S.D.N.Y. Mar. 24, 2014). Generally, in deciding cross-motions for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales*, 249 F.3d at 121; *see Chartis Seguros Mex., S.A. de C.V. v. HLI Rail & Rigging, LLC*, 3 F. Supp. 3d 171, 179 (S.D.N.Y. 2014). But where, as here, the motion and cross-motion seek a determination of the same issues, the Court can consider them together. *Chartis Seguros*, 3 F. Supp. 3d at 179; *Royal & Sun All. Ins., PLC v. E.C.M. Transp., Inc.*, No. 14-CV-3770, 2015 WL 5098119, at *2 (S.D.N.Y. Aug. 31, 2015).

## B.   Discussion

### 1.   Statutory Framework

Congress created ERISA to "ensur[e] that employees and their beneficiaries would not be deprived of anticipated benefits from their private retirement pension plans." *Nat'l Ret. Fund v. Ruprecht Co.*, No. 21-CV-4987, 2023 WL 4106672, at *6 (S.D.N.Y. June 21, 2023). As part of that statute, Congress created the PBGC, which "guarantees the payment of benefits to plan participants and beneficiaries, paying the plan's obligations if the plan terminates with insufficient assets to support its guaranteed benefits." *T.I.M.E.-DC, Inc. v. Mgmt.-Lab. Welfare & Pension Funds, of Loc. 1730 Int'l Longshoremen's Ass'n*, 756 F.2d 939, 943 (2d Cir. 1985).

ERISA defines a "multiemployer plan" as a pension plan "to which more than one employer is required to contribute" and "which is maintained pursuant to one or more collective bargaining agreements." 29 U.S.C. § 1002(37). Employers contributing to a multiemployer plan contribute to a collective pool of assets, which the plan then invests and distributes to the

13

employees of the participating employers when those respective employees' rights vest upon

retirement or reaching a certain age. *See Ganton Techs., Inc. v. Nat'l Indus. Grp. Pension Plan*,

76 F.3d 462, 464 (2d Cir. 1996); *Nat'l Ret. Fund,* 2023 WL 4106672, at *6.

In 1980, Congress enacted the Multiemployer Pension Plan Amendments Act

("MPPAA") to address concerns that ERISA "failed to adequately protect multiemployer

pension plans from the adverse consequences of employer withdrawals, which threatened to

result in the collapse of numerous multiemployer plans, forcing [the] PBGC to assume

obligations in excess of its capacity." *Hoeffner*, 2016 WL 8711082, at *2; *see Nat'l Ret. Fund*,

2023 WL 4106672, at *6. Under the old law, employers had an incentive to withdraw from

pension plans without retaining responsibility for unfunded vested liabilities, which also unfairly

burdened any employers who remained with, and thereby continued funding, the plans. *See*

*T.I.M.E.-DC*, 756 F.2d at 943. The MPPAA addressed this concern with the concept of

"withdrawal liability," which is an amount that the withdrawing employer must pay to the old

pension plan to account for the employer's unfunded vested benefits. *See Trs. of Loc. 138*

*Pension Tr. Fund v. F.W. Honerkamp Co. Inc.*, 692 F.3d 127, 130 (2d Cir. 2012) ("Withdrawal

liability is the withdrawing employer's proportionate share of the pension plan's unfunded vested

benefits."); *Nat'l Ret. Fund*, 2023 WL 4106672, at *6 ("The MPPAA requires an employer that

withdraws from a multiemployer plan to pay its proportionate share of the pension plan's

unfunded vested benefits, known as withdrawal liability."); *Hoeffner*, 2016 WL 8711082, at *3

(withdrawal liability is "an amount representing the share of the old plan's unfunded vested

benefits attributable to a withdrawing employer's participation, to be assessed on the

withdrawing employer by the old plan at the time of the withdrawal"); *see also* 29 U.S.C. § 1382

("When an employer withdraws from a multiemployer plan, the plan sponsor, in accordance with

this part, shall . . . (3) collect the amount of the withdrawal liability from the employer."). Withdrawal liability ensures that an employer withdrawing from a multiemployer pension plan cannot escape paying for vested benefits that the employer has not yet funded. *See T.I.M.E.-DC*, 756 F.2d at 944; *Hoeffner*, 2016 WL 8711082, at *3.

Part 1 of Subtitle E of ERISA, 29 U.S.C. §§ 1381-1405, governs withdrawal liability, applying "[i]f an employer withdraws from a multiemployer plan." *See* 29 U.S.C. § 1381(a). An employer's "withdrawal liability" is defined as "the amount determined under section 1391 of this title to be the allocable amount of unfunded vested benefits," adjusted according to four statutory provisions, if applicable. *Id.* § 1381(b); *see Hoeffner*, 2016 WL 8711082, at *3. For purposes of Part 1, Section 1393(c) defines "unfunded vested benefits" as follows: "with respect to a plan, an amount equal to—(A) the value of nonforfeitable benefits under the plan, less (B) the value of the assets of the plan." 29 U.S.C. § 1393(c); *see Trs. of Gen. Bldg. Laborers' Loc. 66 Pension Fund v. J.M.R. Concrete Corp.*, No. 19-CV-1214, 2023 WL 6385803, at *1 (E.D.N.Y. Sept. 29, 2023) (plan's "unfunded vested benefits" are "calculated as the difference between the present value of vested benefits and the current value of the plan's assets"); *Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Zaro Bake Shop, Inc.*, No. 20-CV-9894, 2021 WL 2350094, at *3 (S.D.N.Y. June 8, 2021) ("A plan's unfunded vested benefits are calculated by finding the difference between the present value of the pension fund's assets and the present value of its future obligations to employees covered by the pension plan."). "A 'nonforfeitable benefit' is defined as a benefit to which a participant is entitled." *Mar-Can Transp. Co., Inc. v. Loc. 854 Pension Fund*, No. 20-CV-8743, 2022 WL 35588, at *2 (S.D.N.Y. Jan. 4, 2022) (citing 29 U.S.C. § 1301(a)(8)).

Part 1 also includes Section 1391(e), which allows for reduction of an employer's
withdrawal liability.  Under that section, where an old plan transfers liabilities to a new plan
based on an employer's withdrawal, the "withdrawn employer's [withdrawal] liability under
[Part 1] shall be reduced in an amount equal to the value, as of the end of the last plan year
ending on or before the date of the withdrawal, of the transferred unfunded vested benefits."  29
U.S.C. § 1391(e); *see T.I.M.E-DC*, 756 F.2d at 946 ("When, as a result of the employer's
withdrawal, some employees will participate in a new multiemployer plan, the amount of
withdrawal liability that the old plan requests should be reduced by the amount of unfunded
vested benefits that it will transfer to the new plan.") (citing 29 U.S.C. § 1391(e)); *Hoeffner*,
2016 WL 8711082, at *4 (same).  "In this way the statute reaches a proper allocation of the
employer's payments on behalf of its employees.  It ensures that both plans are funded and
avoids the possibility of double payments by the employer."  *T.I.M.E.-DC*, 756 F.2d at 946.  If
the parties disagree regarding the amount of an employer's withdrawal liability, Section 1401
provides that "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan
concerning a determination made under sections 1381 through 1399 of [Title 29] shall be
resolved through arbitration."  29 U.S.C. § 1401(a).

Part 2 of Subtitle E of ERISA, 29 U.S.C. §§ 1411-1415, governs "merger or transfer of
plan assets or liabilities."  The general rules governing transfers of liabilities and assets between
multiemployer plans are found in Sections 1411 and 1414.  "Section 1411 provides that a plan
sponsor may cause a multiemployer plan to engage in a transfer of assets and liabilities to or
from another if (1) the proposed transfer complies with regulations of the PBGC (including a
120-day notice requirement), (2) the benefits of participants are not adversely affected, and (3)
other statutory conditions are observed."  *Hoeffner*, 2016 WL 8711082, at *4 (citing 29 U.S.C. §

16

141[1](b)).  "Separately, Section 1414 provides that any transfer of assets from one
multiemployer plan to another need only comply with the asset-transfer rules adopted by the
multiemployer plan, provided that those rules (1) 'do not unreasonably restrict the transfer of
plan assets in connection with the transfer of plan liabilities,' and (2) 'operate and are applied
uniformly with respect to each proposed transfer' (with some reasonable variation in application
allowed to account for the financial impact of a proposed transfer on the plan)."  *Id.* (quoting 29
U.S.C. § 1414(a)).  Neither section requires a transfer of liabilities and assets, and a
multiemployer plan retains discretion to reject such a transfer under Section 1414 subject to the
plan's fiduciary duties.  *See Ganton Techs.*, 76 F.3d at 466; *Hoeffner*, 2016 WL 8711082, at *5.
Moreover, even if a plan does accept a transfer of liabilities under Section 1414, that section only
requires an asset transfer to comply with rules that "do not unreasonably restrict the transfer of
plan assets in connection with the transfer of plan liabilities."  29 U.S.C. § 1414(a)(1); *see
Hoeffner*, 2016 WL 8711082, at *5.

On the other hand, when "an employer has completely or partially withdrawn from a
multiemployer plan . . . as a result of a certified change of collective bargaining representative,"
as happened here (*see* P's Resp. to D's 56.1 ¶¶ 4-6; D's Resp. to P's 56.1 ¶¶ 15-16, 21, 31, 37),
Section 1415 applies, mandating that the old plan transfer liabilities and assets to the new plan
"in accordance with this section."  29 U.S.C. § 1415(a).  Upon satisfying the notice requirements
set forth in Section 1415(b), the old plan's sponsor "shall transfer the appropriate amount of
assets and liabilities to the new plan."  29 U.S.C. § 1415(b)(3).  For the purposes of Section
1415, the "appropriate amount of assets" is "the amount by which the value of the nonforfeitable
benefits to be transferred exceeds the amount of the employer's withdrawal liability to the old

plan (determined under part 1 of this subtitle without regard to section 1391(e) of this title)." 29

U.S.C. § 1415(g)(1).

Upon completion of a transfer of the appropriate amount of assets and liabilities, Section

1415(c) requires a reduction of the employer's withdrawal liability with respect to the old plan.

That section reads as follows:

> (c) **Reduction of amount of withdrawal liability of employer upon transfer of appropriate amount of assets and liabilities by plan sponsor of old plan to new plan**
>
> If the plan sponsor of the old plan transfers the appropriate amount of assets and liabilities under this section to the new plan, then the amount of the employer's withdrawal liability (as determined under section 1381(b) of this title without regard to such transfer and this section) with respect to the old plan shall be reduced by the amount by which–
>> **(1)** the value of the unfunded vested benefits allocable to the employer which were transferred by the plan sponsor of the old plan to the new plan, exceeds
>> **(2)** the value of the assets transferred.

29 U.S.C. § 1415(c).

## 2.      Application

The parties do not dispute that Section 1415(c) applies.  Rather, they dispute whether it

entitles Mar-Can to a reduction of its $1.8 million[10] employer withdrawal liability that the Old

---

[10] The parties do not dispute this amount for the purposes of this motion and use this number for Mar-Can's withdrawal liability to the Old Plan because it was cited by the experts in their respective reports.  (*See* P's Mem. at 9; D's Mem. at 6 (referencing $1.8 million as the amount that Jones calculated for P's withdrawal liability); D's Opp. at 10 (referencing $1.8 million in withdrawal liability while citing to Jones' affidavits).)  Any factual disputes arising from the calculation of Mar-Can's withdrawal liability – including the actuarial assumptions used in that calculation, such as interest rates to apply – are reserved for arbitration.  *See* 29 U.S.C. § 1401(a) ("[A]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1389 of [Title 29] shall be resolved through arbitration."); (*see also* BR Tr. at 30).

Plan assessed.[11]  The question boils down to the following:  what does the term "unfunded vested

benefits allocable to the employer" mean for purposes of Section 1415(c)?  Does it mean the

total amount of unfunded liabilities transferred pursuant to Sections 1415(a) and (b), as Mar-Can

argues?  Or does it refer to the amount of unfunded liabilities that remain after accounting for the

transferred assets, as the Old Plan argues and the *Hoeffner* opinion supports?  If Mar-Can is

correct, it would be entitled to a reduction of its $1.8 million withdrawal liability to zero under

Section 1415(c), based on the following calculation.  The Old Plan transferred to the New Plan

$5.5 million in liabilities and $3.7 million in assets.  (D's Resp. to P's 56.1 ¶¶ 54-55).  The Old

Plan assessed a withdrawal liability of $1.8 million against Mar-Can.  (*Id.* ¶ 21.)  The value of

the transferred unfunded vested benefits allocable to Mar-Can is equal to the transferred

liabilities ($5.5 million).  Subtracting the value of the assets transferred ($3.7 million) from the

unfunded vested benefits ($5.5 million) yields $1.8 million.  Thus, under Section 1415(c),

Mar-Can's withdrawal liability to the Old Plan would be reduced by $1.8 million (the amount by

which the value of the unfunded vested benefits exceeds the value of assets transferred), making

it $0.  If the Old Plan is correct, Mar-Can would be entitled to no reduction, because the

unfunded liabilities remaining after the transfer of $5.5 million in liabilities and $3.7 million in

---

[11] As a preliminary matter, I deny the Old Plan's motion to the extent that it seeks to dismiss the entire Amended Complaint.  The Old Plan does not explain in its briefs why that relief would be appropriate, but I assume that it contends implicitly that it is because the Section 1415 transfer has occurred and Plaintiff is not entitled to any reduction in its withdrawal liability under Section 1415(c).  While the Amended Complaint's second claim refers only to a reduction under Section 1391(e), (AC ¶¶ 76-81), I regard the Amended Complaint as broad enough to cover Mar-Can's request for a recalculation of withdrawal liability under the overall ERISA framework, including any reduction under Section 1415(c), (*see id.* ¶ 81).  Requiring Mar-Can to amend again to spell out a request already contained in the Amended Complaint by implication would waste more time and resources.

assets would be $1.8 million, and that figure does not exceed the value of the transferred assets ($3.7 million).

"[S]tatutory interpretation must begin with the plain language, giving all undefined terms their ordinary meaning while attempting to ascertain how a reasonable reader would understand the statutory text, considered as a whole." *Deutsche Bank Nat. Tr. Co. v. Quicken Loans Inc.*, 810 F.3d 861, 868 (2d Cir. 2015); *see Springfield Hosp., Inc. v. Guzman*, 28 F.4th 403, 418 (2d Cir. 2022) (court's "analysis begins, as it must, with the plain text of [the statute]."). "[I]f [the] statutory language is plain, we must enforce it according to its terms." *Am. C.L. Union v. Clapper*, 804 F.3d 617, 623 (2d Cir. 2015). "To identify a statute's plain meaning, [courts] afford words their ordinary, common-sense meaning and draw on the specific context in which that language is used." *Eisenhauer v. Culinary Inst. of Am.*, 84 F.4th 507, 517 (2d Cir. 2023). I read the statute as a whole rather than "constru[ing] statutory phrases in isolation." *Springfield Hosp. Inc.*, 28 F.4th at 418; *see Am. C.L. Union*, 804 F.3d at 623 ("[W]hen deciding whether the language is plain, we must read the words in their context and with a view to their place in the overall statutory scheme."); *Frank G. v. Bd. of Educ.*, 459 F.3d 356, 368 (2d Cir. 2006) (court's "first task is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.").

In short, "[w]hether a statute is plain or ambiguous is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Frank G.*, 459 F.3d at 368. "[L]anguage is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person. . . ." *Id.* "[W]hen the language of a statute is unambiguous, judicial inquiry is complete." *Spadaro v. United States Customs & Border Prot.*, 978 F.3d 34, 46 (2d Cir. 2020). But if the "meaning is

not clear, [courts] make use of a variety of interpretive tools, including canons, statutory

structure, and legislative history." *Id.* "[Courts] must construct an interpretation that comports

with the statute's primary purpose and does not lead to anomalous or unreasonable results."

*Bakery & Confectionery Union*, 2021 WL 2350094, at *16.

Section 1415 does not define the term "unfunded vested benefits," and neither does Part

2. While Section 1393(c) provides a definition of that term – and it is for that definition that the

Old Plan argues – it expressly applies only "[f]or the purposes of [Part 1]." 29 U.S.C. § 1393(c)

("For the purposes of this part, the term 'unfunded vested benefits' means with respect to a plan,

an amount equal to—(A) the value of nonforfeitable benefits under the plan, less (B) the value of

the assets of the plan."). In addition, the definition found in that section relates to the full plan

for the purpose of calculating an employer's withdrawal liability, and I do not see why this

definition should be incorporated into Section 1415(c), which looks only to the liabilities and

assets that will be transferred regarding a specific employer without reference to the total plan's

assets and liabilities. That the Old Plan must rely on what might generously be called an

inference – that a definition of unfunded vested benefits that by its terms only applies for

purposes of Part 1 should nevertheless apply for purposes of Section 1415(c), which appears in

Part 2 – suggests at least that the plain language of Section 1415(c) is ambiguous. *See Frank G.*,

459 F.3d at 368 (party's "need to rely on an inference to be drawn from the plain language,

rather than the language itself, suggests a degree of ambiguity"). Moreover, that the parties

present two different reasonable interpretations of the term also suggests that the language is not

entirely clear. *See id.* Thus, I find that the plain language is ambiguous: it is not apparent that

the definition of "unfunded vested benefits" for purposes of Section 1415(c) is the same as the

definition of that term for purposes of Section 1391(e).

I conclude that the term "unfunded vested benefits" means, for purposes of Section 1415(c), the amount of liabilities transferred, and that, as Mar-Can contends, its withdrawal liability must therefore be reduced to zero. I base this determination on several factors.

First, the purpose of withdrawal liability is to discourage employers from withdrawing from multiemployer plans, [12] and it would make no sense for employers who have no choice but to withdraw (because their employees changed their bargaining representative) to be stuck with an obligation that they would not have had if they had chosen to withdraw. Yet that is the result under Defendant's interpretation. According to the Old Plan, Mar-Can gets no Section 1415(c) reduction and continues to owe $1.8 million in withdrawal liability to the Old Plan after the Section 1415 transfer of assets and liabilities. But if Mar-Can had chosen to withdraw, as opposed to being forced to withdraw in the circumstances set forth in Section 1415(a), the Old Plan could have been compensated to the extent "assets and liabilities associated with the transferred employees remained with the" Old Plan, *Hazel Park Racing Ass'n, Inc. v. Trs. of the SEIU Nat. Indus. Pension Fund*, 543 F. Supp. 2d 741, 749 (E.D. Mich. 2008), either by withdrawal liability payments, *see id.* ("Since the assets and liabilities associated with the

---

[12] This concept was a key element of the proposed MPPAA, as stated by then Secretary of Labor Ray Marshall:

> [A]n employer that leaves the multiemployer pension plan would be required to pay its fair share of the plan's vested liabilities. The objective of this element is to discourage withdrawals and to provide a financial cushion for the plan which is not now provided by the present system because of the limitations of liability and the absence of any disincentive to withdraw.

*Multiemployer Pension Plan Amendments Act of 1979: Hearings on H.R. 3904 Before Subcomm. on Labor-Management Relations of the House Comm. on Education and Labor,* 96th Cong., 1st Sess. 362 (1979); *see T.I.M.E.-DC,* 756 F.2d at 943-44 (quoting the House report in discussing the policy behind the MPPAA); *id.* at 944 ("[The MPPAA] also reduces an employer's incentive to withdraw from the plan to escape paying for vested benefits that its employees have earned, but that the employer has not yet funded.").

transferred employees remained with the [old plan], the statute requires that the [employers] pay withdrawal liability rather than simply transferring the unfunded vested benefits to the [new plan].”); *T.I.M.E.-DC*, 756 F.2d at 946 (“If employees whose benefits have vested are not transferred to the new plan, then the old plan continues to be responsible for paying those employees’ benefits”), or by transferring unfunded liabilities attributable to Mar-Can employees to another plan.  Had it done the latter, Mar-Can’s withdrawal liability with the Old Plan would have been reduced to $0 under Section 1391(e).[13]  Under the first scenario, Mar-Can would pay $1.8 million in withdrawal liability to cover the unfunded liabilities of the Old Plan attributable to Mar-Can employees that remain on the Old Plan’s books, and under the second, those liabilities come off the Old Plan’s books as a result of the transfer of liabilities that exceed transferred assets by $1.8 million, and Mar-Can would be responsible to the new plan for funding those benefits.  Either way, Mar-Can is responsible for the unfunded liabilities (whether they remain with the Old Plan under the first scenario or end up with the new plan under the second), and the Old Plan is fully compensated.

When the withdrawal is triggered by a change in bargaining representative, however, the transfer of assets and liabilities is mandatory, *see Hazel Park*, 543 F. Supp. 2d at 747, and the unfunded liabilities come off the Old Plan’s books that way.  But according to the Old Plan, Mar-Can nevertheless has to pay it the full withdrawal liability without reduction.  This both leaves the employer owing the same amounts to the Old Plan and the new plan, and compensates

---

[13] That calculation would have been as follows:  the Old Plan could have transferred $1.8 million in liabilities to a different plan, incident to Mar-Can’s withdrawal.  Those transferred liabilities are unfunded and represent vested benefits attributable to Mar-Can.  Thus, under Section 1391(e), the value of transferred unfunded benefits would have equaled $1.8 million, and Mar-Can’s withdrawal liability would be reduced by that same amount, zeroing out its withdrawal liability to the Old Plan.

the Old Plan twice. *See* Pension Benefit Guar. Corp., Opinion Letter 87-12 (Oct. 1987), 1987 WL 68413, at *1 ("[Section 1391(e)] reflects the fact that a transfer of vested benefit liabilities (to the extent not offset by a transfer of assets) reduces a plan's unfunded vested benefits much the same as a payment of withdrawal liability."). Given that a main purpose of the MPPAA's creation of withdrawal liability was to discourage employers from withdrawing from multiemployer pension plans, it is inconceivable that Congress intended that employers who chose to withdraw should come out ahead of those who withdrew because of their employees' actions. Yet the Old Plan's interpretation – which views Section 1415(c) as providing a significantly smaller reduction compared to Section 1391(e) – would do just that. There is no indication that Congress intended such different treatment. Congress was mindful that funds had to be protected regardless of whether the withdrawal was voluntary or not, *see* Pension Benefit Guar. Corp., Opinion Letter 86-7 (Mar. 24, 1986), 1986 WL 38785, at *2 ("Op. Ltr. 86-7") ("The MPPAA and its legislative history show that Congress was concerned about the effect of *any* withdrawal, not just voluntary ones. Any withdrawal causes the same harm to the fund – it was logical for Congress not to distinguish between them on the basis of voluntariness.") (emphasis in original) (quoting *Keith Fulton & Sons v. New England Teamsters*, 762 F.2d 1124, 1131 (1st Cir. 1984), *modified on other grounds*, 762 F.2d 1137 (1st Cir. 1985) (*en banc*))); *cf. Trs. of Loc. 138 Pension Trust Fund*, 692 F.3d at 134 ("Nowhere in the [Pension Protection Act of 2006]'s repeated references to withdrawal did Congress suggest any voluntary/involuntary distinction, notwithstanding the decades-long precedent of employers 'voluntarily withdrawing from pension plans when financially expedient.'"), but there is no support – in the statute, its legislative history, or logic – for the notion that it wanted employers to be worse off when they withdraw based on their employees' choice rather than their own volition.

Second, beyond the statute's purpose, looking at its language in the context of the statutory scheme also supports the interpretation that under Section 1415(c) "unfunded vested benefits" must refer to the total amount of unfunded liabilities transferred under that statute. Section 1415(a) requires the old plan to "transfer assets and liabilities to the new plan in accordance with this section," and Section 1415(g)(1) provides that the appropriate amount of assets to transfer is "the amount by which the value of the nonforfeitable benefits to be transferred exceeds the amount of the employer's withdrawal liability to the old plan" – in other words, the total liabilities (*i.e.*, the nonforfeitable benefits) to be transferred to the new plan, less the employer's withdrawal liability to the old plan.[14]  Section 1415(c)'s sentence structure is different.  Congress separated into distinct subsections the two variables used to calculate the amount of the reduction:  "(1) the value of the unfunded vested benefits allocable to the employer which were transferred by the plan sponsor of the old plan to the new plan" and "(2) the value of the assets transferred."  Considering the value of the transferred liabilities under subsection (1) independent of the transferred assets, those liabilities (or vested benefits) are "unfunded."  Likewise, the value of the transferred assets is considered independently under subsection (2).  And so, under Section 1415(c), to determine the reduction to an employer's withdrawal liability to the old plan, the value of the transferred assets is subtracted from the value of the total transferred liabilities.

---

[14] For purposes of this motion, it is appropriate to use the terms "nonforfeitable benefits," "liabilities," and "vested benefits" interchangeably.  *See Hoeffner*, 2016 WL 8711082, at *8 & n.15 ("The Court notes, however, that Congressional reports and debates use 'vested' interchangeably with the term 'nonforfeitable.'"); *see also* 126 Cong. Rec. S 10070-10201 (daily ed. July 29, 1980) at S-10121 (referring interchangeably between transferred liabilities and unfunded vested benefits when discussing the purpose behind Section 1415).

Moreover, Section 1415(c)(1) refers to "the value of the unfunded vested benefits allocable to the employer which were transferred by the plan sponsor of the old plan to the new plan." "Unfunded vested benefits" in this context cannot refer to the amount of unfunded liabilities that remain after accounting for the transferred assets, as the Old Plan would have it, because that amount is not transferred; only assets and liabilities are. *See* 29 U.S.C. § 1415(a) ("the old plan shall transfer assets and liabilities to the new plan"); § 1415(b)(3) ("then the plan sponsor of the old plan shall transfer the appropriate amount of assets and liabilities to the new plan"). The amount the Old Plan describes is what would be with the new plan *after* the transfer, not what is transferred. Thus, "unfunded vested benefits allocable to the employer which were transferred [from the old plan to the new plan]" must mean the transferred liabilities.[15]

That the resulting reduction will often (but not necessarily) equal the employer's withdrawal liability to the old plan makes sense. "The goal of the withdrawal and transfer provisions of the MPPAA is to ensure that the employer covers its pension obligations in both the old and the new plans," and "withdrawal liability simply is a way of describing an employer's obligation, under its collective bargaining agreement, to continue to fund the old plan to the extent that that plan remains responsible to the employees upon their retirement." *T.I.M.E.-DC*, 756 F.2d at 945-46. Both Sections 1391(e) and 1415(c) reduce an employer's withdrawal liability in connection with a transfer between plans: the former where a plan transfers liabilities incidental to an employer's withdrawal, and the latter where a plan must

---

[15] Under the Old Plan's interpretation, unfunded vested benefits would mean transferred liabilities minus transferred assets. (*See* D's Reply at 3.) If so, the resulting Section 1415(c) reduction formula would be as follows: withdrawal liability reduction equals transferred liabilities minus transferred assets, *then* minus transferred assets again. But the Old Plan does not point to any language in the statute that supports – either explicitly or implicitly – why the definition of unfunded vested benefits requires its own calculation under Part 2, or why the Section 1415(c) formula encompasses an additional implicit step.

transfer both assets and liabilities because the collective bargaining representative changed.  *See* Op. Ltr. 86-7 at *2 (referring to the "the type of situation described in section [1415(c)] and section [1391(e)], *i.e.*, where the multiemployer plan transfers some of its unfunded vested benefits to a plan to be maintained by the withdrawing employer," as affecting an employer's withdrawal liability).  When both assets and liabilities are transferred under Section 1415, the reduction to withdrawal liability must account for the extent to which the liabilities were offset by the transferred assets.  In either event, once the old plan transfers the unfunded liabilities off its books to a new plan, the old plan is no longer responsible for the benefits of the departing active employees and the employer's obligation to the old plan for those transferred liabilities ceases.  Having gotten those unfunded liabilities off its books, the old plan is not entitled to withdrawal liability that duplicates them.  *See id.* at *1 ("Under [Section 1415(c)], the employer's withdrawal liability to the [Old Plan] . . . is reduced to the extent the plan sponsor transfers to the new plan unfunded vested benefits allocable to the employer.").[16]

Third, the structure of the statute militates in favor of Mar-Can's construction because, as it argues, the Old Plan's interpretation creates a potential funding loophole involving situations where an employer leaves a new plan shortly after joining.  (*See* P's Mem. at 10-11; P's Opp. at

---

[16] Relatedly, I reject the Old Plan's argument that Section 1415(c) should be interpreted to provide a "cushion" for the liabilities associated with Mar-Can that were left behind with the Old Plan.  (*See* D's Mem. at 7-9; D's Opp. at 10-12; D's Reply at 3-4.)  As Mar-Can argues, those remaining liabilities (for sixty-five former Mar-Can employees who are retired or deferred vested participants, *see* P's Resp. to D's 56.1 at ¶ 19), are fully funded, (*see* ECF Nos. 206-8, 206-27 at 3-4; *see also* P's Mem. at 4-5; P's Opp. at 9-12; P's Reply at 10-13), and the Old Plan does not point to any statutory language, structure or legislative purpose that suggests it is entitled to compensation for those remaining funded liabilities through Section 1415.  Section 1415 does not involve the transfer of benefits for inactive and retired participants, *see* Pension Benefit Guar. Corp., Opinion Letter 88-6 (Apr. 1988), 1988 WL 192427, at *1 ("Accordingly, it is the opinion of the PBGC that section [1415] contemplates the transfer of benefit liabilities only for participants who are active employees."), and would not affect the benefits associated with those participants.

7-9, 20-21).  In the transfer here, the New Plan received $5.5 million in liabilities and $3.7

million in assets from the Old Plan, leaving a deficit of $1.8 million.  This deficit does not

immediately pose an issue because Mar-Can would begin contributing directly to the New Plan

to fund that deficit over time.  If Mar-Can decided to withdraw from the New Plan in the future,

its withdrawal liability to the New Plan would be based on its contribution history with that Plan.

*See CenTra Inc. v. Centr. States, Se. & Sw. Areas Pension Fund*, 578 F.3d 592, 594 (7th Cir.

2009) ("The pension plan calculates a withdrawing employer's withdrawal liability based in

large part on the employer's history of contributions to the fund."); *Park S. Hotel Corp. v. N.Y.*

*Hotel Trades Council*, 851 F.2d 578, 580 (2d Cir. 1988) ("An employer's past contribution

history is considered in determining its proportionate share of [a plan's] unfunded benefits.").

But an employer joining a new plan under Mar-Can's circumstances would be incentivized to

withdraw immediately, or at least as soon as possible, before making any significant

contributions to the new plan, thereby preventing a large withdrawal liability.  For example,

hypothetically, if Mar-Can decided to withdraw from the New Plan before it built up a history of

significant contributions, the New Plan would have a limited amount of contribution history with

which to calculate Mar-Can's withdrawal liability assessment.  As a result, Mar-Can could leave

the New Plan without a continuing obligation to pay the $1.8 million deficit.  Rather, under the

Old Plan's interpretation, Mar-Can would continue paying its $1.8 million withdrawal liability to

the Old Plan – a plan that no longer carries the liabilities for the benefits that the $1.8 million is

intended to fund – and the New Plan would be left holding the bag.

Congress addressed this concern with Section 1415(f)(2), providing that if an employer

withdraws from the new plan, its withdrawal liability to that plan will be the *greater* of either its

calculated withdrawal liability under Part 1 with respect to the new plan (which, in the

circumstances described above, would be little), or the amount of the Section 1415(c) reduction (subject to a reduction for each passing 12-month period) with respect to the old plan. *See* 29 U.S.C. § 1415(f)(2). Mar-Can's interpretation of Section 1415(c) closes this loophole. If "unfunded vested benefits" in Section 1415(c) means transferred liabilities, then the subsequent reduction amount to Mar-Can's withdrawal liability with respect to the Old Plan would be $1.8 million (representing the amount that $5.5 million in transferred liabilities exceeds the $3.7 million in transferred assets). The withdrawal liability that Mar-Can would owe to the New Plan in this hypothetical would be $1.8 million, or put another way, the amount of the Section 1415(c) reduction (subject to the statutory reduction under Section 1415(f)(2)(B)). Mar-Can would neither escape its obligation to cover the $1.8 million deficit to the New Plan nor would it continue making payments to the Old Plan instead. *See* 2 Employee Benefits Guide § 32.02(f) (2023) (providing an example of how Sections 1415(c) and (f)(2) work to achieve this result); 1C-1C:15B Lexis Tax Advisor – Federal Topical § 1C:15B.04(b)(V) (2024) (to same effect). This aligns with the purpose and goals behind withdrawal liability and the MPPAA's transfer provisions: "It ensures that both plans are funded and avoids the possibility of double payments by the employer." *See T.I.M.E.-DC*, 756 F.2d at 946. Under Mar-Can's interpretation, the amount of the Section 1415(c) reduction becomes a baseline withdrawal liability assessment with respect to the New Plan. By contrast, under the Old Plan's interpretation, the Section 1415(c) reduction would likely never be significant enough to discourage this behavior or keep the New Plan funded.

The Eastern District court in *Hoeffner* reached a different conclusion than the one I reach here. There, the court first determined that Section 1415(c)'s clear language yielded a different reduction than Section 1391(e) regarding withdrawal liability. *See* 2016 WL 8711082, at *9-10.

Comparing the text of both statutes, the court reasoned that both sections provide methods for reducing an employer's withdrawal liability based on the value of unfunded vested benefits transferred, but concluded that Section 1415(c) provides for a "*significantly smaller* reduction of withdrawal liability" as compared to Section 1391(e) under what appears to be – yet is not – identical circumstances. *See id.* at *11. Using the arbitration decision in a case called *Green Gold* as an example, the court explained how Sections 1415(c) and 1391(e) result in different reductions: in that example, an old plan assessed $159,287 in withdrawal liability and transferred $315,388 in liabilities and $156,101 in assets (using the calculation in Section 1415(g)(1)) in a Section 1415 transfer. *See id.* The withdrawing employer argued that the withdrawal liability to the old plan should have been reduced by the full amount – $159,287 – according to Section 1391(e), because that amount represented the transferred unfunded vested benefits. *See id.* Instead, the old plan reduced the withdrawal liability by $3,186 (meaning Green Gold still owed $156,101 in withdrawal liability to the old plan), asserting that this number reflected the amount by which the unfunded vested benefits transferred (not $315,388 in its view, but $159,287 – derived by subtracting the amount of the transferred assets from the amount of the transferred liabilities) exceeded the value of the assets transferred ($156,101) under Section 1415(c). *See id.* This calculation assumed that "the value of the unfunded vested benefits allocable to the employer which were transferred by the plan sponsor of the old plan to the new plan," 29 U.S.C. § 1415(c)(1), was not the value of the transferred liabilities (as Mar-Can argues) but the amount by which the transferred liabilities exceeded the transferred assets (as the Old Plan argues).

Both the employer in *Green Gold* and the plaintiffs in *Hoeffner* argued that this interpretation of Section 1415(c) could not be intended because it would result in a windfall to

the old plan, which could wipe liabilities off its books while continuing to collect money intended to pay for those liabilities from the withdrawn employer. *See Hoeffner*, 2016 WL 8711082, at \*12. While the court recognized that this argument had appeal, it decided that Section 1415(c) yielded a different reduction than Section 1391(e) because Section 1415(c) requires an employer to compensate the old plan for the assets the plan was compelled to transfer. *See id.* For support the court looked to Sections 1411 and 1414 – two sections that permit a plan to refuse an employer's request for a transfer of assets and liabilities – reasoning that because Section 1415(a) compels a plan to transfer assets and liabilities and removes the option to reject that transfer, it made sense that Section 1415(c) provides additional compensation to the old plan. *See id.* Thus, the court ultimately concluded that it "makes sense that Section 1415(c) not only requires the employer to compensate the old plan for any [unfunded vested benefits] remaining on the old plan's books (as Section 1391(e) does), but also to reimburse the old plan in the amount of assets the old plan was forced to release." *Id.*[17]

I respectfully disagree with my esteemed colleague's conclusion. First, it seems that *Hoeffner* assumed that the Section 1393(c) definition of unfunded vested benefits applies to Part 2 even though that definition only applies to Part 1, and it did not wrestle with the ambiguity of that term as used in Part 2. Second, the *Hoeffner* theory – compensating the old plan for the compelled transferred assets – finds no support in the statutory language or the legislative history. And there is no logical reason why the old plan would need to be compensated for the

---

[17] Any concern the Old Plan expresses regarding the departing assets, (*see* D's Mem. at 8; D's Opp. at 9-10; D's Reply at 4), appears disingenuous, as Mar-Can had requested to remain with the Old Plan via a participation agreement, but the Old Plan refused. (D's Resp. to P's 56.1 ¶¶ 17-20.) If the Old Plan really had a concern about transferring assets out, it had an easy way to avoid that result.

loss of assets when it also unloaded a corresponding amount of liabilities.  Under *Hoeffner* the
old plan is compensated twice for the same transaction:  the unfunded liabilities are wiped off its
books and it still receives continued payment of withdrawal liability associated with those
liabilities.  But the statutory framework suggests no such thing, and there is no indication that
Congress intended an old plan to receive extra compensation or for an employer to fund two
plans for the same liabilities in these circumstances.[18]

Finally, *Hoeffner*'s conclusion conflicts with the statutory purposes of the MPPAA,
creates tension within the statutory framework, and leads to anomalous results.  Section 1415(c)
is a relief provision provided for employers who have withdrawn because of certified changes in

---

[18] *Hoeffner* cited Section 1415(e) as showing that the statute focuses on the "health of the
old plan" because that subsection "contemplates a transfer of limited liabilities (capped at the
withdrawal liability amount) without any corresponding transfer of assets where the old plan is in
reorganization or the transfer would cause the old plan to go into reorganization."  2016 WL
8711082, at *12 n.24.  But Section 1415(e) also focuses on the health of the new plan by capping
the transfer of liabilities to the withdrawal liability amount.  This cap prevents a funding gap like
the hypothetical discussed earlier.

For example, let us presume that the cap did not exist and, as a result, an old plan
currently in reorganization transferred $9 million in liabilities to a new plan and assesses the
employer's withdrawal liability to be $5 million.  Because the old plan is in reorganization, there
would be no transfer of assets.  Under Section 1415(c), the employer's withdrawal liability
would thus be reduced in full (the $9 million in liabilities transferred exceeds $0, *i.e.,* the value
of assets transferred where none were transferred), except that the amount of that reduction
would be only $5 million, *i.e.*, the total amount of the withdrawal liability.  If the employer then
withdrew from the new plan before a significant amount of withdrawal liability was assessed
under Part 1 with respect to that plan (based on a short history of contributions), the employer's
withdrawal liability to the new plan would be $5 million under Section 1415(f)(2)(B).  Yet the
new plan received $9 million in liabilities from the transfer and there would remain a $4 million
funding gap to the new plan upon the employer's withdrawal.  Section 1415(e)(2)(B) resolves
this gap by limiting the transfer of liabilities to an amount equal to the employer's withdrawal
liability to the old plan.  As a result, the old plan in this example could only transfer up to $5
million in liabilities (equal to the employer's withdrawal liability), and the transferred liabilities
would match the amount of the Section 1415(c) reduction.  That Section 1415(c) reduction
amount would also become the baseline withdrawal liability with respect to the new plan if the
employer withdrew after the transfer.  Thus, Section 1415(e) also focuses on the health of the
new plan and supports my conclusion as to the meaning of Section 1415(c).

collective bargaining representatives, or put another way, for actions taken not by the employers but by their employees. *See* Op. Ltr. 86-7 at *1. It is counterintuitive that an intended relief provision would subject those employers to double payments. Additionally, *Hoeffner*'s interpretation of Section 1415(c) risks creating the payment loophole discussed above that could leave new plans underfunded. This is because, under *Hoeffner*, the Section 1415(c) reduction will nearly always (if not always) be an insignificant amount, effectively rendering Section 1415(f)(2)(B) superfluous.[19] When analyzing an ambiguous statute, it should be interpreted to avoid absurd, anomalous, or unreasonable results. *See Frank G.*, 459 F.3d at 368; *Bakery & Confectionery Union*, 2021 WL 2350094, at *16. It cannot be that Congress would incentivize employers to quickly withdraw from new plans after a Section 1415 transfer, given the MPPAA's purpose to discourage employer withdrawals and to ensure that both plans are adequately funded. *See T.I.M.E.-DC*, 756 F.2d at 943-44; *Hazel Park*, 543 F. Supp. 2d at 748. Under my interpretation of the meaning of unfunded vested benefits for purposes of Section 1415(c) – that it refers to transferred liabilities – Section 1415(f)(2)(B) neatly resolves this loophole, preventing that section from being rendered superfluous and avoiding the anomalous result where one plan would remain underfunded unless an employer was subjected to double payments.

This interpretation dovetails with the Second Circuit's reading of the relevant provisions:

> The term 'withdrawal liability' simply is a way of describing an employer's obligation, under its collective bargaining agreement, to continue to fund the old plan to the extent that that plan remains responsible to the employees upon their retirement. The statute further requires the old plan to reduce the employer's withdrawal liability based on the amount of assets and liabilities transferred as a result of transferred employees. In this way the statute reaches a proper allocation

---

[19] For example, in the *Green Gold* arbitration decision analyzed in *Hoeffner*, the Section 1415(c) reduction was only $3,186. *See* 2016 WL 8711082, at *11.

of the employer's payments on behalf of its employees.  It ensures that both plans
are funded and avoids the possibility of double payments by the employer.

*T.I.M.E.-DC*, 756 F.2d at 946.  Under Section 1415(c), "the old plan sponsor, in calculating the

employer's withdrawal liability, must compute the amount by which the employees' unfunded

vested benefits transferred exceeds the value of employer contributed assets transferred to

determine by what amount it must reduce the withdrawal liability."  *Id.* at 947.  In other words,

to avoid double payments and keep both plans funded, Section 1415 requires that after the

transfer, the employer pays the plan that will be carrying the unfunded liabilities.  Here that

means that Mar-Can will fund those liabilities by paying the New Plan going forward, and the

Old Plan has been fully protected because it transferred more in liabilities than assets and has no

further responsibility for those unfunded liabilities.

     This interpretation also comports with the PBGC's viewpoint.  It has described Section

1415(c)'s reduction as a "relief" provision not for transferor plans but for employers whose

employees change their bargaining representative.  Op. Ltr. 86-7 at *1.  That relief is that to the

extent the old plan transfers unfunded liabilities for which the employer will be responsible to

the new plan, its withdrawal liability to the old plan is reduced.  *See id.*

     Thus, for the reasons set forth above, I grant Mar-Can's motion for partial summary

judgment, (ECF No. 206), to the extent that it seeks an order requiring a reduction of its

withdrawal liability under Section 1415(c).  For those same reasons, I deny the Old Plan's

motion for summary judgment and cross-motion for summary judgment, (ECF Nos. 202, 216), to

the extent that it requests an order finding that 29 U.S.C. § 1415 does not require any reduction in Mar-Can's withdrawal liability.[20]

## IV.   **ATTORNEYS' FEES**

Finally, the Old Plan seeks an award of attorneys' fees and costs under Section 1451(e), arguing that the award is warranted because it "will obtain a degree of success on the merits" and "the award will encourage other withdrawing employers to avoid needless and unreasonable litigation" while benefitting the Old Plan and its participants and beneficiaries.  (D's Mem. at 12-14.)  Mar-Can requests leave to move for an award of attorneys' fees "[i]f the Court's ruling on this motion were to effectively end the litigation."  (P's Opp. at 25; *see* P's Mem. at 24.) Mar-Can also contends that the Old Plan is not entitled to ERISA's mandatory fee-shifting provision because this action is not to compel collection of withdrawal liability, and, in any event, Mar-Can has paid that liability in full.  (P's Opp. at 25.)

Section 1451(a) provides:

> A plan fiduciary, employer, plan participant, or beneficiary, who is adversely affected by the act or omission of any party under this subtitle with respect to a multiemployer plan, or an employee organization which represents such a plan participant or beneficiary for purposes of collective bargaining, may bring an action for appropriate legal or equitable relief, or both.

---

[20] I express no opinion about the parties' other arguments regarding mass withdrawal, (*see* D's Mem. at 10-11; D's Opp. at 10-11; D's Reply at 5-7; P's Opp. at 13; P's Reply at 9-10), as those arguments do not bear on the proper interpretation of Section 1415(c).

In addition, as I stated in my July 14, 2023 Order, (ECF No. 246), the issues raised in the parties' sur-replies and attached papers, (ECF Nos. 240, 241), as well as the subsequent letters filed by the parties (ECF Nos. 242-245), are not relevant to the question of statutory interpretation before me.  Any potential inconsistencies with the parties' positions in different cases, or any effect those inconsistences may have, will be addressed when those issues arise in the appropriate cases and at the appropriate times.  Relatedly, the declaration of actuary Bryan McCormick, (ECF No. 229), is not relevant for the purposes of this motion, so I do not rely on that declaration or address the Old Plan's arguments to strike it.

29 U.S.C. § 1451(a). Section 1451(e) "provides that the court may award all or a portion of the costs and expenses incurred, including attorney's fees, to the 'prevailing party' in connection with any action relating to a multiemployer plan," except that a fee award is mandatory when a fund obtains a judgment recovering withdrawal liability payments. *United Plant & Prod. Workers Loc. 175 Pension Fund v. Kilkenny v. J. Pizzirusso Landscaping Corp.*, No. 20-CV-2527, 2022 WL 4139160, at *6 (E.D.N.Y. Aug. 9, 2022) (citing 29 U.S.C. § 1451(e)). The district court exercises its discretion to award any fees under this section. *See id.*; *Div. 1181, Amalgamated Transit Union – N.Y. Emps. Pension Fund v. NYC Dep't of Educ.*, No. 13-CV-9112, 2018 WL 4757938, at *2 (S.D.N.Y. Oct. 2, 2018). The court must consider "whether a party has obtained some degree of success on the merits," *Div. 1181*, 2018 WL 4757938, at *2 (citing *Donachie v. Liberty Life Assur. Co. of Boston*, 745 F.3d 41, 46 (2d Cir. 2014)), but also may consider the following additional discretionary factors:

> (1) the degree of opposing parties' culpability or bad faith; (2) ability of opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions.

*Id.* (addressing 29 U.S.C. § 1132(g)(1))*; see United Plant*, 2022 WL 4139160, at *6 (sections 1132(g)(1) and 1451(e) governed by the same factors). "Although fees may be awarded to either party, it is well-established that Congress intended the fee provisions of ERISA to encourage beneficiaries to enforce their statutory rights." *Div. 1181*, 2018 WL 4757938, at *2.

As a preliminary matter, Mar-Can is correct that this is not an action brought by the Old Plan to compel withdrawal liability payments, so ERISA's mandatory fee provision for successful cases collecting delinquent plan contributions does not apply. *See United Plant*, 2022

WL 4139160, at *5-6 (collecting cases); *see id.* at *6 (applying mandatory fee provision "in awarding fees where the fund commences an action to compel the payment of withdrawal liability").  And as the Old Plan has not obtained a degree of success on the merits here, I deny the Old Plan's motion and cross-motion for summary judgment to the extent that they seek a discretionary award of attorneys' fees.  Conversely, as Mar-Can is the prevailing party, I grant its request for leave to move for a discretionary attorneys' fee award.  A schedule for that motion will be set at the upcoming conference.  The parties should be prepared to address whether there is any reason to delay the return to Mar-Can of the escrowed withdrawal liability payments it has made into the Court's registry, and what the next steps in this litigation (beyond the fee motion) should be.

## V.  __CONCLUSION__

For the foregoing reasons, the Old Plan's motion for summary judgment, (ECF No. 202), is DENIED.  Mar-Can's motion for partial summary judgment, (ECF No. 206), is GRANTED.  Mar-Can's cross-motion, (ECF No. 211), is GRANTED IN PART to the extent that it seeks to exclude the expert report of Jones and seeks leave to move for an award of attorneys' fees and DENIED IN PART as to the remaining requests for relief.  The Old Plan's cross-motion for summary judgment, (ECF No. 216), is GRANTED IN PART to the extent that it seeks to exclude the expert reports of Hofing and DENIED IN PART as to the remaining requests for relief.  The Clerk of Court is respectfully directed to terminate the pending motions, (ECF Nos. 202, 206, 211, 216).  The parties shall appear for an in-person status conference on April 8, 2024 at 10:15 a.m.

**SO ORDERED.**

Dated: March 22, 2024
       White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.